IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 8, 2011

## EMMETT RUSSELL MCGEE, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bedford County**
No. 11940     Robert G. Crigler, Judge

───────────────

**No. M2010-01187-CCA-R3-PC - Filed August 19, 2011**

───────────────

The petitioner, Emmett Russell McGee, Jr., appeals from the Bedford County Criminal
Court's denial of post-conviction relief from his convictions based upon guilty pleas on two
counts of possession with intent to sell three hundred grams or more of cocaine and the
resulting sentences of ten and eleven years to be served consecutively.  On appeal, the
petitioner contends that his guilty plea was not voluntarily entered due to the ineffective
assistance provided by trial counsel.  Specifically, he contends that trial counsel gave him
improper advice concerning the possible sentences he could receive if he proceeded to trial.
In addition, for the first time on appeal, the petitioner raises a challenge to the consecutive
nature of the sentences, asserting that it is illegal and excessive in light of the fact that the
elements of both convictions arose out of the same transaction.  Following review, we
conclude that the post-conviction court properly determined that trial counsel was not
ineffective.  Further, we conclude that the petitioner has waived review of his second issue.
As such, the denial of his petition for post-conviction relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON,
P.J., and NORMA MCGEE OGLE, J., joined.

Roger Clay Parker, Shelbyville, Tennessee, for the appellant, Emmett Russell McGee, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney
General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles,
Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Procedural History**

The facts underlying the petitioner's convictions, as recited by the State at the guilty plea hearing, are as follows:

> . . . Sometime prior to September 14, 2006, well, for a period of time, the Drug Task Force had been making controlled buys from Neal Greenway in Bedford County, Tennessee.
>
> On the - - September 14, 2006, they made a controlled buy from Mr. Greenway and then later that day actually conducted a traffic stop of Mr. Greenway and arrested him for some of the controlled buys they had made prior to September 14.
>
> They then interviewed Mr. Greenway and he agreed to cooperate with them. He indicated that he was - - would stay part of the time with a girlfriend at a residence in Shelbyville and that he would also stay part of the time at a residence in the - - on Bell Buckle/Wartrace Road, I guess what would be in the Wartrace area. And that the residence that he stayed at in the Wartrace area was with the [petitioner]. And he agreed to - - and he indicated that he had a quantity of cocaine at the residence in Wartrace. And he agreed to take the Drug Task Force out there to collect that.
>
> The agents of the Drug Task Force then went with Mr. Greenway to that residence. Of course, at this point now, the Court's heard some of the proof in previous motions to suppress . . . - - but in effect, there was a knock on the door. The [petitioner] opened the door. Director Lane observed another male sitting inside the residence. And it appeared that he was making a movement that concerned Director Lane. So Director Lane went into the residence and secured the situation.
>
> It was at that point that Director Lane saw in plain view sitting on an end table beside the couch a quantity - - it was actually kind of a mixture of powder and rock-like substance that was - - turned out to be approximately nine grams of Schedule II. Again, it was kind of a powder, rock-like mixture. But it was cocaine or cocaine base, kind of a mixture of the two. And there was also a small quantity of marijuana.
>
> Director Lane seized that. And then as the Court's heard, there was inquiry about obtaining consent to search. That was not obtained. So the Drug

Task Force, with the assistance of the sheriff's department, secured the scene and then members of the Drug Task Force went and obtained a search warrant. This was prior - - this was before midnight. So this is in the late evening hours of September 14, 2006.

The search warrant was obtained and the Drug Task Force returned but by then it was after midnight. So now we're into the early morning hours of September 15, 2006.

Then upon executing the search warrant at the residence, the Drug Task Force discovered a substantial quantity of powder cocaine. They discovered it in a duffel bag in what would be characterized as Neil Greenway's room. The duffel [bag is] attributed to Shawn Wade. They discovered a substantial quantity of powder cocaine. And that weighed 210.2 grams.

They discovered in the bedroom that was attributed to the [petitioner] a substantial quantity of powder cocaine. It weighed 194.6 grams. They also discovered a smaller quantity of cocaine, I believe, in a vehicle that was attributed to Sara Haley, who is the - - or was, at the time, the [petitioner's] girlfriend.

Also during the course of the search they discovered a - - what they were characterizing as a .9 millimeter machine pistol loaded with a clip in the [petitioner's] bedroom. They discovered a [12 gauge] shotgun in Neil Greenway's bedroom. They discovered a .9 millimeter pistol in Ms. Haley's vehicle.

They discovered a substantial amount of money. I [have not] totaled this, [$1232] found in a dresser in the [petitioner's] bedroom, $400 in Sara Haley's wallet, [$1100] in a carrying case in the [petitioner's] bedroom, $900 behind the [petitioner's] dresser in his bedroom, and $270 in a money bag in his bedroom, and then $896 was taken off Shawn Wade. He was the large male who was sitting on the couch that had the suspicious movement.

They also discovered in a safe that Neal Greenway claimed possession of $115 in paper money and $38.50 in change. And then they - - there was also approximately, I believe, nine grams of powder cocaine that was taken from that safe that . . . - - - that was the drugs that Neal Greenway was escorting the Task Force out there to take possession of.

An examination of the money that was seized revealed that some of the

serial numbers matched serial numbers used in controlled buys made from Neal Greenway. But all that money was found except for a small portion of it. All the money that had matching serial numbers from the controlled buys with Neal Greenway was found in the [petitioner's] bedroom. There were eight $20 bills, and one $10 bill that were found in the [petitioner's] bedroom that, again, the serial numbers matched serial numbers of money used in controlled buys. There was also a $20 bill from the $400 taken from Sara Haley that matched the - - the serial numbers on it matched serial numbers from money used in controlled buys with Neal Greenway.

The - - Neal Greenway as the Court is aware, has pled open to various charges, and has a sentencing hearing pending sometime in the future. He was prepared to testify against the [petitioner]. In addition to all of that, of course, the Task Force agents could testify to, which is basically what I've summarized to this point, he would testify that he had been staying with the [petitioner] for a period of time. They had been long time friends going back to when they were in school together. They had started a landscaping business together, however, business was not going so well, and that the [petitioner] had asked, and Neal Greenway had agreed, to participate in selling cocaine to make money.

Neal Greenway would testify that the [petitioner] typically purchased approximately 14 and a half ounces - - or 14 or so ounces of cocaine weekly. He would typically do that on a Friday, that the [petitioner's] chief source of supply was Sean Wade. And that Mr. Wade - - normally that would occur by the [petitioner] going to Nashville and meeting with Mr. Wade. And - - however, on this occasion, Mr. Wade had actually come down and brought the cocaine, had brought it to the [petitioner's] residence for the purposes - - purpose of ultimately selling to the [petitioner]. And also, apparently Sean Wade had expressed interest in how the [petitioner] was moving such a substantial amount of drugs in a short period of time, that being, you know, [fourteen] ounces of cocaine per week. . . .

Based upon these acts, the petitioner was indicted for one count of possession of 300 grams or more of cocaine with intent to sell and one count of possession of 300 grams or more of cocaine with intent to deliver, both Class A felonies. A plea deal was negotiated by trial counsel, and a subsequent guilty plea hearing was held. At the hearing, the trial court conducted a thorough voir dire of the petitioner, informing him of his rights. The court specifically informed the petitioner that he was to ask questions if he did not understand any portion of the agreement or proceeding. The petitioner was shown his plea agreement and acknowledged that he had signed it voluntarily. He stated that he read the petition in its

entirety prior to signing it and indicated his understanding of the agreement.

After the required voir dire and recitation of the facts, the trial court accepted the petitioner's guilty pleas to two counts of possession of a Schedule II controlled substance with the intent to sell, both lesser included Class B felonies. The petitioner acknowledged that he understood the nature of the offenses and what elements the State would be required to prove to obtain a conviction. Trial counsel for the petitioner acknowledged that the State had "enough to sustain a conviction." A brief colloquy occurred during which the court noted that it is "not necessary that the [petitioner] agree to each and every detail of what the State says, but I gave you the definitions of these two offenses." The court then addressed the petitioner and asked, "Are you admitting you're guilty of the two offenses you're offering to plead guilty to?" The petitioner responded, "Yes, sir." The court further inquired if the petitioner understood the charges and asked, "So I guess you are admitting that you possessed those two substances with intent to sell them; is that correct?" The petitioner again responded, "Yes, sir."

The court then explained in detail the full range of punishment for the charges to which the petitioner was pleading guilty. The petitioner acknowledged on the record that he understood. The State also indicated that as part of the plea agreement, a certified question of law challenging two motions to suppress would be reserved. The petitioner again acknowledged that he understood the agreement he was accepting, that his decision was freely and voluntarily made, and that he had no complaints with trial counsel's representation. At that point, the court accepted the petitioner's pleas to two counts of possession of cocaine with intent to sell. Per the agreement, the court also imposed consecutive sentences of ten years and eleven years for the two convictions.

Thereafter, trial counsel filed the appeal regarding the certified questions of law which had been reserved. A panel of this court affirmed the trial court's ruling and denied relief. *State v. Emmett Russell McGee*, No M2007-02872-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 15, 2009). The petitioner subsequently filed a *pro se* petition for post-conviction relief, asserting that his pleas were not entered voluntarily based upon the ineffective assistance of counsel. Following the appointment of counsel, an amended petition for relief was filed. A hearing on the matter was later held.

The petitioner testified that he hired trial counsel shortly after his arrest and met with her numerous times at court appearances. He stated that counsel negotiated a plea agreement with the State and that she had tried to represent his interests. He acknowledged that trial counsel had obtained discovery but stated that she only reviewed the lab reports with him. He stated that he did not understand why he was being charged with possessing such a large amount of cocaine.

-5-

According to the petitioner, he never saw a written plea offer from the State, stating that "it was pretty much numbers I was hearing." He indicated that the first offer was from Director Tim Lane of the Drug Task Force. The petitioner testified that he, Mr. Lane, and trial counsel were in the hallway when Director Lane told the petitioner that he had "a gift for [him]" and offered him fifteen years. The petitioner testified that he refused the offer. The petitioner indicated that the deal he eventually accepted was relayed to him in the hallway of the courthouse in the presence of his parents. He testified that the twenty-one-year deal scared both him and his parents but that trial counsel had indicated it was in his best interest. While acknowledging that he knew the agreement was twenty-one years, he insisted that the meaning of consecutive or concurrent was not explained to him.

The petitioner testified that he accepted the agreement only because trial counsel told him that "we can beat this." He indicated that trial counsel assured him that they could prevail on the certified questions of law. He stated that trial counsel told him to "[g]ive me six months to a year, and we will go to the appellate court, and the appellate court goes by the law, and we can beat it down there." The petitioner reiterated that he accepted the agreement only because of these assurances from trial counsel that she thought it was his best option.

The petitioner testified that he did not understand the nature and consequences of his plea agreement, again testifying that no one ever explained the meaning of consecutive and concurrent. He asserted that if he had understood the agreement, he would have accepted the fifteen years offered by Director Lane. When asked, the petitioner stated that he felt trial counsel could have done more for him than she did such as "investigating the residence" and interviewing other witnesses.

The petitioner was also questioned by the post-conviction court and shown a copy of the plea petition. The petitioner indicated that his signature was on the petition, but he denied reading the agreement in its entirety. He acknowledged that the court had questioned him prior to acceptance of the agreement, but he claimed that he lied because he thought it "was pretty much procedure." The petitioner acknowledged testifying at the plea hearing that his plea was voluntarily and understandingly entered, but he claimed that he answered and accepted the plea solely on trial counsel's advice.

Trial counsel testified and indicated that she was hired by the petitioner shortly after his arrest and continued to represent him through the appellate process. Trial counsel testified that she did not specifically recall that the petitioner gave her the names of any witnesses to interview but stated that she did speak with the officers involved in the case and reviewed the reports. She also recalled that she spoke with the petitioner's father and girlfriend and attempted to speak with the two men who were charged with the petitioner.

Trial counsel testified that she received discovery and reviewed it with the petitioner. She indicated that the petitioner was helpful and gave input regarding the search warrant issues.

Trial counsel testified that she discussed a possible settlement of the case with the State. She recalled a prior agreement offered by the State, which she relayed to the petitioner, but stated she was unable to recall the exact details. She testified that she believed that the initial offer had been high, possibly twenty-seven or twenty-eight years. She did not recall that Director Lane of the Drug Task Force had ever spoken with her or the petitioner regarding an offer but stated that "I would not have taken Mr. Lane's offer as something that I would expect the district attorney to agree with, without putting [Director Lane and the State] together." Trial counsel indicated that she believed the agreement to which the petitioner pled was the best deal that she could get from the State. She specifically testified that it was the petitioner's ultimate decision to accept the agreement. Trial counsel stated that she believed the two suppression issues that were the subject of the certified questions were good questions. Although she felt positive about them, she testified that she never guaranteed the outcome of the appeal to the petitioner. She did not recall any other offer by the State which resulted in lower sentences in exchange for foregoing the certified question appeal.

When asked about the original indictment, trial counsel acknowledged that the two Class A felony charges were in the alternative and that the sentences would have merged. She did not specifically recall whether both of the Class B felonies to which the petitioner ultimately pled stemmed from the 409 grams of cocaine which the petitioner had originally been indicted. She did recall, however, that "there were a couple of labs, and then there was some marijuana."

After hearing the evidence presented, the post-conviction court denied the petition for post-conviction relief. This timely appeal followed.

**Analysis**

On appeal, the petitioner contends that his guilty plea was not knowingly and voluntarily entered because he was denied the effective assistance of counsel. He also raises, for the first time on appeal, the issue of whether his sentence is excessive because the elements of proof for each conviction are the same and arose from the same transaction. In evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353

(Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). Indeed, a

> court charged with determining whether . . . pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate that guilty pleas be voluntarily and intelligently made. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *Alford*, 400 U.S. at 31).

To succeed in a challenge for ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient representation and (2) prejudice resulting from the deficiency. In the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably-based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel, however, is dependant upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). "A trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*,

40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, *conclusions of law* are reviewed under a purely *de novo* standard, with no presumption of correctness. *Id.* at 458.

## I. Ineffective Assistance of Counsel/Voluntariness of the Plea

The petitioner asserts that the post-conviction court erred in denying him post-conviction relief because the evidence established that trial counsel was ineffective and that this ineffectiveness led to an involuntary plea. On appeal, the petitioner changes the basis for his ineffective assistance of counsel claim. He now contends that trial counsel was ineffective by failing to properly advise him of the possible sentence he faced at trial based upon the two Class A felony charges for which he was originally charged and to argue merger on appeal. According to the petitioner, trial counsel told him he could receive a possible twenty-five to thirty-year sentence if he proceeded to trial. He asserts that this shows that "trial counsel exaggerated the amount of punishment he could have received and his guilty pleas were not informed, voluntary, or knowingly entered" as a result. The basis for his argument stems from the fact that the two Class A felonies he was originally charged with were alternative theories and that, as a result, the convictions would have merged into a single conviction. As a Range I offender, the sentencing range for a Class A felony would have been between fifteen and twenty-five years. *See* T.C.A. § 40-35-112(1) (2010).

As noted by the State, this claim now asserted by the petitioner was not raised in the petition, and very little of the evidence admitted at the hearing casts any light on the issue's resolution. As found by the post-conviction court, the petitioner has simply failed to establish that trial counsel was deficient in her performance and, accordingly, his claim of an involuntary plea has not been established. Review of the record before us reveals no evidence to preponderate against the post-conviction court's findings.

The record indicates that trial counsel diligently represented the petitioner from the beginning of his case. The evidence against the petitioner was overwhelming - he was caught in his own residence with a large amount of cocaine, several firearms, and large sums of money. In addition, witnesses were prepared to testify as to the petitioner's activities with regard to selling large amounts of drugs weekly. While we do note that trial counsel acknowledged that, had the petitioner proceeded under the original indictment, the offenses would have merged, nonetheless, he still faced a possible exposure of twenty-five-years incarceration. Trial counsel in this case negotiated a reasonable plea agreement that allowed the petitioner to pursue two certified questions of law and still avoid the possible maximum exposure. That the appeal of his certified questions was not successful cannot negate the importance of his being allowed the opportunity to argue what trial counsel believed were valid issues on appeal.

Additionally, the record of the guilty plea hearing belies the petitioner's contention that his plea was not knowingly and voluntarily entered. The trial court, prior to accepting the petitioner's plea, went into great detail with the petitioner about the charges to which he was pleading, the possible sentences he faced, and the rights he was waiving. The petitioner stood before the court, acknowledged his understanding of the agreement, and stated under oath that it was his decision to accept the agreement. That testimony now stands in the record, and the petitioner's attempt to disavow his statements is not well-taken by this court. The petitioner has failed to carry his burden of establishing his entitlement to post-conviction relief.

## II. Excessive Sentence

The petitioner also raises a second issue in this appeal. He contends that the effective twenty-one-year sentence he received is excessive based upon a violation of double jeopardy principles. The petitioner contends that the "State is attempting to inflict punishment on the [petitioner] for separate charges based on the same facts." He argues that the evidence establishes that his two convictions were based on a single transaction at the defendant's residence. He further contends that the convictions should be merged and that trial counsel should have argued this.

As noted, this assertion has not been raised previously either in the petition for post-conviction relief or by the evidence at the hearing. In fact, the petitioner acknowledges this and asks that this court reach the issue pursuant to the "plain error doctrine." *See* Tenn. R. Crim. P. 52(b). However, as is well-established, issues may not be raised for the first time on appeal and shall be treated as waived. *See* T.C.A. §§ 40-30-106(g), -110(f) (2010). Moreover, the plain error doctrine does not apply to post-conviction actions. *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000). As such, we do not review the issue raised.

### CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-10-